**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| WILLIAM M. TRUSSELL,<br>    Plaintiff, | §<br>§<br>§ | |
| v. | § | No. 3:10-CV-02169-L (BF) |
| | § | |
| COMMISSIONER OF THE<br>SOCIAL SECURITY ADMINISTRATION,<br>    Defendant. | §<br>§<br>§ | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

This is an appeal from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying the claim of William M. Trussell ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"). The Court considered Plaintiff's Brief, filed on February 18, 2011, Defendant's Brief, filed on March 16, 2011, and Plaintiff's Reply Brief, filed on March 31, 2011. The Court reviewed the record in connection with the pleadings. For the following reasons, this Court recommends that the final decision of the Commissioner should be REVERSED and REMANDED for reconsideration.

**Background**[1]

**Procedural History**

On November 8, 2007, Plaintiff filed an application for DIB benefits under Title II of the Act, alleging an amended disability onset date of May 1, 2003. He claimed disabilities of osteoarthritis, degenerative joint disease, fibromyalgia, spinal stenosis, depression, chronic pain, hypertension, hypoglycemia, degenerative disc disease, a history of multiple hip surgeries and prosthetic hip joints,

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

hip infections, left shoulder replacement surgery, multiple pelvic fractures, back surgery, gastric bypass surgery, multiple hernia surgeries, and abdominal trauma wound surgery. (Tr. 169.) The Administrative Law Judge ("ALJ") noted that Plaintiff remained insured for Title II benefits through December 31, 2004. (Tr. 13.)[2] At the time his insured status expired, Plaintiff was 56 years old. (Tr. 165.)

The Commissioner denied Plaintiff's Title II application initially and again upon reconsideration. (Tr. 54-57, 59-61.) Plaintiff requested a hearing before an ALJ and that request was granted. (Tr. 62-63.) The hearing was held on March 27, 2009, at which time Plaintiff, a medical expert ("ME"), and a vocational expert ("VE") testified. (Tr. 20-47.)

In his August 21, 2009 decision, the ALJ analyzed Plaintiff's claim pursuant to the familiar five-step sequential evaluation process.[3] At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity through his date last insured of December 31, 2004. (Tr. 13.) At step two, the ALJ found that Plaintiff had the following "severe" impairments: bilateral degenerative joint disease of the hips with left hip surgeries in 1997 and 1999, right hip dislocations secondary to a March 2004 accident, left shoulder osteoarthritis with injections and surgery in 2001, with repeat surgery in April 2004, low back pain with injections and computerized tomography

---

[2] The relevant time period for Plaintiff's Title II application is May 1, 2003, his alleged onset date, through December 31, 2004, his date last insured. *See* 20 C.F.R. § 404.131.

[3] The five analytical steps involve (1) whether the claimant is performing "substantial gainful activity"; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from doing any other work. 20 C.F.R. §§ 404.1520, 416.920. "A finding that a claimant is disabled or not disabled at any point in the five-step process is conclusive and terminates the [Commissioner]'s analysis." *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).

showing multi-level degenerative disc disease with canal stenosis throughout the spine (with foot drop in 2003 that resolved), and fibromyalgia, for which he became an avid biker to relieve pain and for treatment. (*Id.*) At step three, the ALJ determined that through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 of the Social Security Regulations. (*Id.*)

Next, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform a modified range of sedentary work. (Tr. 16.) At step four, the ALJ determined that through the date last insured, Plaintiff was capable of performing his past relevant work as a financial officer, independent financial broker, and marketing consultant. (Tr. 18.) Accordingly, the ALJ concluded that Plaintiff was not disabled at any time through December 31, 2004. (Tr. 19.) The Appeals Council declined Plaintiff's request for review on October 15, 2010. (Tr. 1-5). Thus, the ALJ's decision became the final decision of the Commissioner, from which Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

**Plaintiff's Age, Education, and Work Experience**

Plaintiff was born on June 25, 1948. (Tr. 139). He has a doctoral degree, and was previously employed as a real estate agent, Chief Financial Officer, broker, and marketing consultant. (Tr. 24-25.)

**Plaintiff's Medical Evidence**

The medical record establishes that Plaintiff underwent surgery on both hips, with his left hip replaced in July 1997 and his right hip replaced in October 1999. (Tr. 825, 830.) He dislocated his right hip in March 2004 and again in April 2004. (Tr. 758, 760.) He submitted to surgical revision of the right total hip arthroplasty due to recurrent dislocation in November 2006 and again in

February 2007.  (Tr. 439, 462).  He later developed an infection of the right hip and required irrigation and debridement in April 2007 with implantation of an antibiotic spacer. (Tr. 420.) In June 2007, it was found that the antibiotic spacer had dislocated and an additional right hip arthroplasty was performed in July 2007. (Tr. 407, 492.) On December 6, 2005, Plaintiff was also noted to have a failed total left hip arthroplasty secondary to recurrent dislocation.  (Tr. 391.)

On July 10, 2006, Plaintiff submitted to a decompressive laminectomy of the thoracic and lumbar spine due to spinal stenosis at T11-12 and at L4-5.  (Tr. 384.)  His treating rheumatologist, Dr. Scott Zashin, advised in August 1999 that Plaintiff had severe osteoarthritis. (Tr. 709.) An MRI of Plaintiff's lumbar spine, performed in September1999, indicated degenerative changes at every level, with osteoarthritic changes at both the lumbar spine and the sacroiliac joints bilaterally.  (Tr. 527.) A diagnosis of lumbar spinal stenosis and lumbar degenerative disc disease was provided. (*Id*.) Plaintiff was noted to have spinal stenosis at every level, some of which was congenital and some of which was degenerative.  Plaintiff also had developed a foot drop, probably more related to the problems he was having at the L3-4 level. (Tr. 521.)  A CT scan was performed on August 18, 2003 to evaluate the right foot drop. (Tr. 907.) The scan found multi-level lumbar spondylosis and severe multi-level degenerative disc disease. (*Id*.) This was also confirmed by myelogram. (Tr. 908-909.) An MRI of Plaintiff's thoracic spine, performed on July 2, 2006, found degenerative changes at every level, with moderately severe spinal canal stenosis and evidence of mild cord compression and increased T2 signal within the thoracic cord.  (Tr. 505.)  The stenosis was deemed to be probably pronounced when Plaintiff is upright and weight-bearing. (*Id*.)

In December 2001, Plaintiff underwent arthroscopic surgery on his left shoulder at Presbyterian Hospital of Dallas. (Tr. 918.) He then had a left shoulder arthroplasty in December 2007. (Tr. 537.)

Plaintiff's ten-year surgical and medical history, beginning in 1996, reveals Plaintiff had replacement surgery of his hips in July 1997 and October 1999; multiple dislocations of his hips and surgery to revise these dislocations, including right hip dislocations three times in a 34-day period between March 12, 2004 and April 15, 2004, right hip revisions performed on April 25, 2000, April 22, 2004 and November 14, 2006, left hip dislocations in September 1997 and January, October and November 2005, and left hip revision in December 2005; gastric bypass surgery in May 2002; a number of lumbar spine injections; and thoracic and lumbar decompressive surgery. (Tr. 334.)

Plaintiff submitted medical records from the Texas Orthopaedic Associates, dated from February 1996 to September 2005. (Tr. 812-834.) Plaintiff was seen periodically over the course of those years by several doctors for issues regarding his hips and left shoulder pain. (*Id.*)

Dr. Charles Banta, an orthopedic specialist, treated Plaintiff from August 1998 to September 2007. (Tr. 501-528.) On August 25, 1998, Plaintiff complained of bilateral buttock and leg pain. (*Id.*) Dr. Banta diagnosed Plaintiff with lumbar spinal stenosis and lumbar degenerative disc disease. (*Id.*) The doctor noted that Plaintiff used a cane to help in ambulation. (*Id.*) In August 2003, Plaintiff presented to the doctor with a right foot drop with decreased motion and sensation and pain. (Tr. 522.) The doctor surmised a probable disc herniation in the lumbar spine and ordered an MRI. (*Id.*) Dr. Banta noted that Plaintiff has spinal stenosis at every level, as determined by diagnostic studies, and later recommended a series of injections. (Tr. 515, 521.) In June 2005, Plaintiff complained of having more back and left leg pain and low back irritation. (Tr. 519.) The doctor

5

noted Plaintiff is an avid biker and ordered another MRI. (*Id.*) In June 2006, Dr. Banta noted that Plaintiff's lumbar spine had been severely degenerative for many years. (Tr. 513.) Plaintiff was given muscle relaxers and he noted that Plaintiff was using a walker. (*Id.*)

On April 7, 2009, Dr. Banta provided a medical source statement. (Tr. 1445-51.) He was specifically asked to consider Plaintiff's condition on or before December 31, 2004, the date that Plaintiff was last insured for disability benefits purposes under the Act. (Tr. 1445.) Dr. Banta indicated that Plaintiff's symptoms and functional limitations are reasonably consistent with his underlying impairments. (Tr. 1446.) Further, in a typical workday, he would experience pain or other symptoms severe enough to constantly interfere with the attention and concentration needed to perform even simple work tasks. (Tr. 1446.) Dr. Banta advised that Plaintiff can stand/walk about two hours and can sit about four hours in an eight-hour workday. (Tr. 1447.) He would need to take occasional, unscheduled breaks of five to ten minutes, and during periods of standing and walking, he would need to use a cane or other assistive device. (*Id.*) Additional postural limitations were reported and the doctor estimated that Plaintiff's impairments or treatment would likely cause him to be absent from work more than four days per month. (Tr. 1448.) He indicated that Plaintiff was unable to be gainfully employed. (Tr. 1449.)

Plaintiff entered into the care of Dr. John J. Cush on February 14, 2005, due to chronic joint problems, osteoarthritis, degenerative disc disease, and low back pain. (Tr. 1241.) Plaintiff reported sleep disturbance, depression, and muscle spasms. He indicated a pain level of 7 on a 0-to-10 scale, with 10 representing the most severe pain. (*Id.*) Dr. Cush performed a physical examination, which noted multiple tender points, and he reviewed diagnostic tests, which indicated moderate central canal stenosis and severe bilateral neural foraminal stenosis. (Tr. 1242.) Dr. Cush diagnosed

osteoarthritis and secondary fibromyalgia and advised that the fibromyalgia and depression needed to be better managed. (*Id.*) He opined that Plaintiff was disabled. (*Id.*) Subsequent records reflect a continuing course of treatment for arthritis and fibromyalgia. (Tr. 1222-1238.)

Dr. Cush completed a medical source statement on April 9, 2009. (Tr. 1452-1459.) Dr. Cush was also asked to consider Plaintiff's condition on and before December 31, 2004. (Tr. 1452.) The doctor indicated diagnoses of osteoarthritis, degenerative disc disease, fibromyalgia, spinal stenosis, depression, and chronic pain. (*Id.*) Clinical findings and objective signs included multiple tender joints, spinal pain on range of motion, and numerous positive tender trigger points. (*Id.*) He advised that Plaintiff's symptoms and limitations were reasonably consistent with his impairments. (Tr. 1454.) Dr. Cush was of the opinion that Plaintiff would frequently experience pain or other symptoms in a typical work day which would interfere with the attention and concentration needed to perform even simple work tasks. (*Id.*) Dr. Cush opined that Plaintiff can sit less than two hours and can stand/walk less than two hours in a eight-hour workday. (Tr. 1455.) Further, Plaintiff would need to take unscheduled breaks four to ten times per day of 15 to 30 minutes at a time. (*Id.*) While engaged in occasional standing and walking, Plaintiff must use a cane or other assistive device. (*Id.*) Additional postural limitations were noted. The doctor advised that Plaintiff's impairments would likely produce "good days" and "bad days" and he estimated that Plaintiff's impairments or treatment would likely cause him to be absent from work more than four days per month. (Tr. 1456.)

**Plaintiff's Testimony at the Hearing**

Plaintiff testified that as of his onset date of disability, May 1, 2003, he had approximately five hip revisions, with problems in both hips, but greater issues with the right than the left. He reported numerous hip dislocations over many years. Plaintiff testified that he was in chronic pain

7

and the pain had only gotten worse. He also had left shoulder replacement but continues to have pain in both shoulders, problems with his neck, and also has neuropathy. (Tr. 27.) He advised that his hip just pops out of place and is very painful when it dislocates. (Tr. 28.) Plaintiff stated that his orthopedist, Dr. Banta, advised him not to undergo back surgery because the doctor felt that there were just too many problems. (Tr. 28-29.)

Plaintiff further maintained that he has been suffering from depression, like most people with chronic pain, since the 1990's and that his depression has gotten progressively worse since 2004. (Tr. 29-30.)

Plaintiff testified that he was on narcotic pain medication for ten years and had to go through rehabilitation and detox to get off of the medication. (Tr. 33.) He stated that he cannot have a pain pump implanted because he has an active infection in his right hip, for which he is taking antibiotics. (*Id.*) He stated that he has pain which radiates down the back of his left leg to his knee. He spends most of his day reclining and using a massage table. His physical therapist told him not to sit in a chair because of the curvature of his spine. Plaintiff explained that his best position is reclining and he has been using a recliner since the early 2000's. (Tr. 35-36.)

Plaintiff explained his exercise routine and said that his rheumatologist, Dr. Cush, recommended he exercise as a way to address his fibromyalgia. (Tr. 37.) He stated that he chose to ride a bicycle and that riding a bicycle alleviated his pain. However, as soon as he got off of the bicycle, his pain would recur. (Tr. 38.) He said he is no longer able to ride a bicycle. (*Id.*)

**The Hearing**

Other than the Plaintiff testifying at the hearing, an ME and a VE also testified. The ME, Dr. John Billinghurt, an internist and a non-examining source, reviewed Plaintiff's medical record and

testified that the evidence reflected bilateral degenerative disease of the hips, with bilateral total hip arthroplasties, right hip dislocation, and repeat right hip surgery in April 2000 with additional dislocation of the right hip and repeat surgery in April 2004. (Tr. 39.) He stated that Plaintiff also had left shoulder osteoarthritis with injections in 1997 and 2001 and left shoulder surgery in December 2001. (Tr. 40.) He testified that the evidence showed Plaintiff had chronic lower back pain, having undergone injections in 1999, a myelogram in 2003, which revealed multi-level degenerative disc disease with neuroforaminal narrowing at multiple levels, and an MRI which revealed multi-level degenerative disc disease and osteoarthritis, central canal stenosis, and neuroforaminal narrowing. (Tr. 40.) The doctor stated that subsequent to December 31, 2004, the date last insured, Plaintiff had additional back problems and submitted to injections, had a dislocation of his left hip and had a number of additional hip operations, left shoulder surgery, and was found to have peripheral neuropathy and some opiate dependence for which he submitted to detoxification. (Tr. 40-41.) Dr. Billinghurt also mentioned records reflecting Plaintiff's bicycle riding and stated that he was impressed that the records indicated Plaintiff as an avid biker. (Tr. 41.) He indicated that the records showed that the exercise was consistent with prescribed treatment for fibromyalgia. (*Id.*) The doctor also testified that some records described the Plaintiff as doing well or being pain free at various times prior to December 31, 2004. (Tr. 39.)

Dr. Billinghurt opined that as of the date last insured, Plaintiff could have performed sedentary work but he needed the ability to stand and stretch every 30-45 minutes, for a few minutes. He advised that Plaintiff should avoid ropes, ladders, and scaffolds, and reported occasional postural limitations. He also recommended that Plaintiff should not perform overhead reaching with his left shoulder and left arm. (Tr. 41-42.) Dr. Billinghurt acknowledged that Plaintiff was taking opiates

prior to his date last insured and that these opiates are prescribed for moderate to severe pain. (Tr. 42.) He also advised that the thoracic spine MRI in 2004 showed significant changes which could be a source of Plaintiff's pain, and moderate pain could interfere with attention and concentration. (Tr. 43.) He also stated that Plaintiff's medications, alone, could affect attention and concentration. (Tr. 44.)

The VE, Patricia Collins, identified Plaintiff's past work as sedentary, with the exception of his real estate agent job which was light in exertion. She described his jobs as either skilled or "highly skilled." (Tr. 45.) Based upon a hypothetical question presented by the ALJ, which assumed the functional capacity assessment reported by Dr. Billinghurst, the VE indicated that all of the Plaintiff's past work could be performed except for his job as a real estate agent. (*Id.*) However, she stated that if he lacked the sedentary capacity for standing and walking, he could not perform such work competitively, and could not perform any work at all. (Tr. 45-46.) On cross-examination, the VE stated that a significant interference with attention and concentration needed to perform complex or detailed tasks would preclude performance of Plaintiff's past work. (Tr. 46.)

**The Decision**

The ALJ found that Plaintiff, through the date last insured of December 31, 2004, had severe impairments of bilateral degenerative joint disease of the hips with left hip surgeries, right hip dislocations, left shoulder osteoarthritis with injections and surgeries, low back pain, multi-level degenerative disc disease with canal stenosis throughout the spine, and fibromyalgia. (Tr. 13.) He further determined that despite these impairments, Plaintiff had the ability to perform a restricted range of sedentary work, consistent with the opinion of ME witness, Dr. Billinghurst, and the treatment records of Texas Orthopaedic Associates. (Tr. 16-18.) The ALJ found that such functional

capacity would allow Plaintiff to return to his past relevant work as a financial officer, independent financial broker, and marketing consultant and that he was, therefore, not disabled. (Tr. 18-19.)

## **Standard of Review**

To be entitled to social security benefits, a plaintiff must prove that he is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove his disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

## Issues

1. Whether the Commissioner properly considered medical opinion evidence.

2. Whether the Commissioner used the proper legal standard to evaluate Plaintiff's severe impairments.

3. Whether the Commissioner properly evaluated Plaintiff's credibility.

## Analysis

**Whether the Commissioner Properly Considered Medical Opinion Evidence**

Plaintiff alleges that the ALJ erred by failing to consider his treating physicians' medical source opinion statements. (Pl.'s Br. at 10.) The opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). However, if the ALJ is not going to give the treating source's opinion controlling weight, he must evaluate certain factors, such as: the length, nature and extent of the treatment relationship, the frequency of examination, the supporting medical evidence presented by the physician and the record as a whole, and the physician's specialization. 20 C.F.R. § 404.1527(d)(2)-(6). Furthermore, "[g]ood cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). "We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 404.1527(d)(2*).*

Moreover, Social Security Ruling 96-5p discusses the policy on medical source opinions and defines a medical source statement as a "medical opinion . . . about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." SSR 96-5p, 1996 WL 374183, at *4. These statements are opinions based on the medical sources' personal knowledge of the individual. *Id.* The

13

Ruling further states that medical source statements submitted by treating sources are opinions entitled to special significance and may be entitled to controlling weight. *Id.* Furthermore, adjudicators must weigh medical source statements and provide appropriate explanations for accepting or rejecting such opinions. *Id.* at *5.

Physical RFC questionnaires were completed by Drs. Banta and Cush and submitted to the ALJ on April 8, 2009. (Pl. Br. at 10.) These questionnaires were forwarded to the ALJ after the hearing, but four months before the ALJ issued his decision on August 21, 2009. *Id.* The ALJ failed to mention either questionnaire in his opinion. (*See* Tr. 11-19.) As stated previously, Dr. Banta was Plaintiff's treating orthopedist from 1998-2007, and Dr. Cush, a rheumatologist, began seeing Plaintiff in February 2005. (Tr. 501-528; 1241.) Both doctors suggested that, on or before December 31, 2004, Plaintiff lacked the RFC to perform even sedentary work. (Tr. 1446-1449; 1454-1457.) Specifically, and of significant importance, Dr. Banta noted that Plaintiff's pain was so severe that it would constantly interfere with the attention and concentration needed to perform even simple work tasks. (Tr. 1446.) Similarly, Dr. Cush noted that Plaintiff's pain would frequently interfere with the attention and concentration needed to perform simple tasks. (Tr. 1454.) In a typical 8-hour workday, Dr. Banta opined that Plaintiff could sit about four hours and stand or walk about two hours; thus, not being able to complete a full 8-hour working day. (Tr. 1447.) Dr. Cush was of the opinion that Plaintiff could sit less than two hours and stand or walk less than two hours. (Tr. 1455.) Again, Plaintiff was unable to complete a typical 8-hour work day.

These questionnaires are based on the physicians' records and examination of Plaintiff, and specifically considered their treatment of Plaintiff on and before his date last insured of December

31, 2004.[4] Therefore, the Court finds these questionnaires to be medical source statements under SSR 96-5p, which should be entitled to special significance. Furthermore, the Court finds that the ALJ should have explained the weight he gave to the opinions and that failure to do so was error.

Defendant counters that the ALJ's failure to address the medical source statements of Drs. Banta and Cush was error, but such error was harmless. (Def.'s Br. at 9.) Defendant asserts that if the ALJ had discussed their opinions, he would have disregarded them because the opinions were unlike any other medical record. (*Id.*) The Court is unable to say what the ALJ would have done. Contrary to Defendant's assertion, the questionnaires are neither unsupported by the medical findings nor inconsistent with the evidence in the record as a whole. For his argument, Defendant refers solely to the records of Texas Orthopaedic Associates, and the ME's testimony regarding these records, which discuss Plaintiff's bicycle riding and in one entry notes Plaintiff as being pain-free. (*See* Def.'s Br. at 11; Tr. 812-834.) However, upon examination of those same records, the Court found that while the May 12, 2004 entry noted Plaintiff was pain free, the June 21, 2004 entry stated that Plaintiff presented with "pain in his left perithoracic spine area." (Tr. 815-16.) That entry also stated Plaintiff was hypersensitive to touch at that area and that the physician was going to order an MRI. (Tr. 815.) Defendant also argues the records show that Plaintiff was participating in a 100-mile bike ride in July 2004. (Def.'s Br. At 11.) However, upon examination of the record, the physician actually stated that Plaintiff was trying to get ready for a 100-mile bike ride but was experiencing

---

[4] The Court notes that Dr. Cush didn't begin treating Plaintiff until February 14, 2005, roughly six weeks after his date last insured. However, the Court finds this short-time frame irrelevant when considering his diagnoses of degenerative disc disease, fibromyalgia, spinal stenosis, and chronic pain, which are not conditions that come about abruptly and are well documented in the medical record. Furthermore, Dr. Cush made a notation that Plaintiff was first seen on February 14, 2005. (Tr. 1452.)

15

symptoms of pain in his thoracic spine. (Tr. 814.) In that same July 2004 entry, the doctor also stated that he was going to have Plaintiff show his MRI results to Dr. Banta so Dr. Banta could assess whether Plaintiff needed to submit to injections. (*Id.*)

Dr. Banta was well aware of Plaintiff's bicycle riding and was the physician who noted that Plaintiff was an avid biker in June 2005. (Tr. 519.) That entry by Dr. Banta also stated that Plaintiff was having more back and left leg pain and that the pain had increased. (*Id.*) Plaintiff testified at the hearing that riding a bicycle was the only way he could relieve his pain. (Tr. 37-38.) Dr. Banta had knowledge of Plaintiff's exercise when he completed the medical source statement. Furthermore, Defendant's argument that the medical source statements aren't like any other record fails. The medical record is extensive and Plaintiff's diagnoses provided by Drs. Banta and Cush, especially chronic pain, are well-documented throughout the record.

Finally, the Court can't find the error was harmless because the VE testified that if Plaintiff had significant interference with the attention and concentration needed to perform complex or detailed tasks then it could preclude Plaintiff's ability to perform his past work. (Tr. 46.) In his medical source statement, Dr. Banta indicated that Plaintiff's pain was so severe that it would constantly interfere with the attention and concentration needed to perform even simple work tasks. (Tr. 1446.) Similarly, Dr. Cush noted in his medical opinion that Plaintiff's pain would frequently interfere with the attention and concentration needed to perform simple work tasks. (Tr. 1454.) These opinions are consistent with one another and also consistent with the ME's testimony that Plaintiff was experiencing moderate levels of pain at various times and that such pain could affect attention and concentration. (Tr. 43.) Further, the ME testified that the opiates that Plaintiff was

16

taking could, in and of themselves, affect Plaintiff's attention and concentration. (Tr. 44.) The Court notes the ALJ failed to address Plaintiff's attention and concentration in the RFC assessment.

Based on review of the record, it is possible that the ALJ would have considered or assigned greater weight to the opinions if he had evaluated them according to the rules set out in 20 C.F.R.§§ 404.1527 and 416.927. The Court points out the almost ten-year treatment relationship of Plaintiff and Dr. Banta as one such factor the ALJ should have at least considered. If greater weight had been accorded these opinions, a different RFC might have resulted. In turn, Plaintiff may have been found unable to perform his past relevant work, or unable to perform any work at all. Failure to consider the questionnaires and explain the weight given was prejudicial error.

The Court finds that the ALJ's legal errors in considering the medical evidence will necessarily require reconsideration, not only of the medical evidence, but of the remaining issues.

### **Recommendation**

Because the Commissioner failed to consider the medical source opinions of Plaintiff's treating sources, this Court recommends that the District Court REVERSE and REMAND the Commissioner's decision for reconsideration consistent with this recommendation.

SO RECOMMENDED, February 14, 2012.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

The United States District Clerk shall serve a copy of these findings, conclusions and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must serve and file written objections within fourteen days after service. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within fourteen days after service shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).